

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00569-CR

CHRISTOPHER SWILLEY                                           APPELLANT

V.

THE STATE OF TEXAS                                                 STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY
TRIAL COURT NO. 1329409R

----------

## OPINION[1]

----------

Appellant Christopher Swilley appeals his conviction for the felony offense of cruelty to animals. Appellant contends that the trial court erred by denying his motion for a mistrial after the jury heard evidence of an extraneous offense also involving cruelty to animals. Appellant further asserts the evidence was insufficient to support his conviction. We affirm the trial court's judgment.

[1]*See* Tex. R. App. P. 47.2(a).

## Background

In the indictment, the State alleged Appellant intentionally, knowingly, or recklessly tortured or in a cruel manner killed or caused serious bodily injury to an animal, to-wit, a dog, by shooting said dog with a crossbow, a state jail felony. *See* Tex. Penal Code Ann. § 42.092(b)(1), (c) (West 2011). The dog in question was a stray, which falls within the statutory definition of an "animal." *See id.* § 42.092(a)(2). The offense was punishable by confinement in a state jail facility for not more than two years or less than 180 days and a fine not to exceed $10,000. *Id.* § 12.35 (West Supp. 2014). After a jury found Appellant guilty, the trial court assessed his punishment at two years' confinement in a state jail.

## Evidence

Roy Ponce testified that on April 11, 2012, he heard a loud noise like a dog in a lot of pain "just screamed and took off running." He looked out his front door through his glass storm door and saw Appellant, his neighbor, carrying a crossbow and walking away from the street toward the back of Appellant's house, which was directly across the street from Ponce's home.

Ponce testified that a Husky mix that had taken up residence as the neighborhood dog was not lying in his front yard as it normally did. Ponce described the dog as a friendly stray that often played with his children and who came through a break in his wooden fence to eat with his other dogs. Ponce denied ever seeing the dog act in a rough or aggressive manner. He, his wife, and his children were not afraid of it.

Ponce's next-door neighbor said there were many strays in the neighborhood over the years. She said this dog had been in the neighborhood four to five months and often slept in her front yard; during that time she had never seen any aggressive behavior. She said, "I saw the dog on almost a daily basis and he was never aggressive to me."

Ponce testified that he walked to the back of his house and found the dog had come through the hole in the fence and was lying under his carport with an arrow in it. He said there was a lot of blood and described the dog as breathing heavily. As Ponce approached, the dog got up, bumped into a carport post—which caused the arrow to fall out—walked down the alley where it laid itself down again, and did not get back up. Ponce's children were in the backyard and, after seeing the dog, became angry. Ponce's wife called 9-1-1.

Fort Worth Police Officer Nathan Owens was dispatched to the scene and found the wounded dog—whining, bleeding, and hurt—lying in the alley. The dog was a black and white, medium-sized Husky or shepherd mix that weighed about fifty pounds and had different colored eyes. Officer Owens observed a considerable amount of blood on the pavement and in the grass of the house next door to Ponce's house. Officer Owens explained that he called Animal Control when he arrived, but he cancelled his call to it when the Humane Society, whom someone else had called, arrived first. He crossed the street and knocked on the door of Appellant's house, but no one answered, and Appellant's Jeep was not at the house. Witnesses told him Appellant had gotten in his Jeep and

3

left the area. Officer Owens estimated the Humane Society arrived within ten minutes after he did and provided medical assistance to the dog. Officer Owens did not recall any neighbors complaining about the dog being aggressive. He said people cannot act with cruelty towards animals just because they are strays.

Eric Hopkins had previously worked in animal hospitals off and on for twenty years and had worked for the Humane Society of North Texas for about two and one-half years, taking care of animals during the day and acting as on-call emergency responder at night for Tarrant and Parker Counties. He recalled that the dog in this case appeared to be in a great deal of pain and was "very bloody, [with] holes in his neck around the chest area. It was very complacent. It wasn't acting mean. [I] [p]icked it up, [and it] licked on me as I was putting it inside the transit van to take it away." Hopkins transported the dog to the Humane Society's East Lancaster location, where the veterinarian prescribed antibiotics and pain medications until she could see it the next morning. Hopkins visited the dog almost daily and described it as a "[s]weet, loving dog. One of the best dogs I've seen up there."

Detective Ryan Stepp, with the Fort Worth Police Department's central criminal investigations unit, was assigned to the case the next day. Detective Stepp testified he reviewed the report and went to the scene to get his own perspective on it. He talked to witnesses, including Ponce and other neighbors, and viewed the bloodstains and a trail of blood from which he determined that the

4

dog was shot in the driveway between Ponce's and Ponce's neighbor's houses and then went through the hole in the fence into Ponce's back yard.

Detective Stepp learned that the week before the dog was shot, Appellant had called in complaints on April 5 and April 6 to Animal Control about a large stray dog digging in flower beds and fighting with other dogs in the neighborhood. Appellant's complaints to Animal Control said nothing about the dog being aggressive towards Appellant or his wife. Detective Stepp went to Appellant's house and said "there [might] have been a few flower beds, but they looked like they had been kept up." He said he knocked on the door but no one answered.

Detective Stepp spoke with Appellant's next door neighbor, N.P., who owned a compound bow and arrows, which Detective Stepp photographed, but no crossbow. Detective Stepp described a crossbow as more like a rifle with a bow set on top of it, whereas a compound bow was an actual bow with gears at the end that helped a person with the draw. A "fixed blade broadhead" bolt from a crossbow was found at the scene where the dog was shot and was introduced into evidence as State's Exhibit 35. Detective Stepp said his understanding was that a bolt was different from an arrow used with a compound bow in that a bolt was shorter than an arrow and a bolt did not necessarily have a nock at the end. He said a bolt from a crossbow was capable of killing someone or an animal, torturing an animal, or causing serious bodily injury.

Detective Stepp processed the bolt for DNA but not for fingerprints because it was covered in blood. The DNA results did not relate to Appellant.

5

Based upon his investigation, Detective Stepp concluded that Appellant shot the dog and that there was no evidence of justification as the dog was not aggressive or attacking anyone. He also spoke to Dr. Cynthia Jones of the Humane Society; she explained the severity of the wounds to him, and he concluded the wounds constituted serious bodily injury. He explained that in Texas it is a criminal offense to cause even a stray animal serious bodily injury unjustifiably. He wrote out an arrest warrant for Appellant for cruelty to animals.

Appellant's wife, Delia Swilley, testified that she and Appellant had lived at the residence across from Ponce's since 2007. Their home had been broken into six or seven years earlier, and they had reported stolen electronics to the police. Later, they learned that other things had been stolen as well, such as tools, speakers, and things Appellant was using in a church program. She testified that Appellant did not own a crossbow and that if he had one, she had never seen it. She denied that Appellant ever went hunting and denied that he had either blade or camouflage arrows for hunting.

Appellant's wife testified she got home from work on the evening of the dog's injury at about 6:45 p.m. They both took showers, ate dinner, and watched television. She testified she did not hear an animal scream, did not hear a commotion of adults and children outside or across the street, did not hear the police arriving, and did not hear anyone knock on the front door or ring the doorbell. She had seen the dog around for some time in the neighborhood. The dog would lie down in front of her door and not move. She stated the dog never

6

growled, bit, or jumped on her. It would just jump down, and that was what scared her. If she came out of the front door, it would move, but it would then go and "undo" the tulips. She denied knowing that the dog had been living across the street for four or five months or that it played with the children there, but she added that she was almost never at home. About two weeks before the dog was shot with the arrow, she had seen it playing in her yard and had asked Appellant if he knew that dog. She denied telling her husband to shoot the dog or to get rid of it because it was digging up her garden. She denied that Appellant left in his Jeep to go anywhere that night and said that the policeman lied if he said Appellant's Jeep was not there.

Appellant denied shooting the dog with a crossbow. He testified he had always had pets and had a mix that looked like "Benji" now. He denied wanting to hurt an animal. Regarding the photos of the dog, Appellant said, "[T]he pictures were horrific. I thought that was terrible." He denied leaving the house in his Jeep at any time that evening. He insisted he was there all evening and heard nothing—not the dog's yelp, not the neighbors coming out to help the dog, not the commotion across the street, and not the police arriving, interviewing people in the street, and knocking at his door. Appellant explained that his house was further away and that he was probably taking a shower. Appellant denied not being there.

Appellant admitted he had at one time owned both a compound bow and a crossbow but said his crossbow had been stolen. He thought his house was

7

burglarized around 2009. He reported to the police everything that was stolen. Detective Stepp confirmed that a burglary was reported in 2006 but said that the report made no mention of a crossbow. Appellant said it was only later, when going on a camping trip, that he discovered his crossbow had also been stolen. He said he called the police to report it but hung up when he determined it was pointless. Appellant admitted to Detective Stepp that he had owned a Horton crossbow and that the bolt in question that the dog was shot with was a Horton bolt. Appellant maintained, however, that his bolts had also been stolen, that they had only been target bolts, and that he had never owned bolts like the one used on the dog, which was an expensive fiberglass bolt. Appellant said State's Exhibit 35 was short enough to be a crossbow bolt and had a hunting tip. Appellant maintained he used only target bolts because targets were the only things for which he used the crossbow. Appellant said his bolts had bullet tips with mild points. Appellant denied ever owning a high-dollar fiberglass bolt with a hunting razor edge like the one on State's Exhibit 35. Appellant admitted hunting once in his life but denied ever hunting with a bow.

Appellant admitted calling Animal Control to complain about the Husky two days in a row the week before the dog was shot. Appellant also said that before the offense, he had called the police several times on Saturday nights because of loud parties at Ponce's home; Appellant explained that he had to get up early Sunday morning to go to church. Appellant suggested that Ponce shot the dog and, knowing Ponce's children would be upset with him if they found out, Ponce

8

made up the story blaming Appellant. Appellant theorized that his complaints to the police about loud parties at Ponce's house gave Ponce a reason for revenge. Appellant even suspected that Ponce might have stolen his crossbow in the burglary six years earlier and shot the dog with it. Appellant had not mentioned his theory that Ponce stole the crossbow and shot the dog in his statement to Detective Stepp, and he admitted it "was just a thought that I had." Appellant acknowledged Ponce and his family told the police that they saw him drive away after putting the crossbow in his Jeep.

Appellant admitted the dog never acted aggressively toward him but claimed the dog frightened his wife; he then admitted all the dog ever did was sleep on his porch and, when it encountered his wife, jump up and run off. He agreed it never harmed him or his wife and that it did "no growling, no biting, no nothing." Appellant asserted his admission that the dog was not aggressive at all showed that he had no reason to have shot the dog. Appellant contended it was not his job to find out who shot the dog but the State's. "Take prints and go get that guy. It's real simple. . . . I mean, anyone that just watches TV can do that."

Dr. Cynthia Jones, the attending veterinarian who worked full-time for the Humane Society, said she was called the night the dog came into care, was given the dog's weight and condition, and instructed the person who called her to give the dog pain management. Dr. Jones performed her full examination the next morning. Regarding her first encounter with the dog, she said,

9

The dog—when I first saw the dog, there was a lot of mud and a lot of blood on his chest and front legs. He was in good spirits. Difficulty walking a little bit on his front legs. He was not aggressive. He was hungry. He was fairly docile. I did not, when I first examined him, have to sedate him in any way. I had no difficulty trying to determine his injuries. During the shaving and cleaning process, I was given no trouble by him whatsoever.

She described four wounds that the dog received from the bolt and stated that, in her opinion, the only way for it to have received those four wounds in the way that it did was for it to have been lying down when it was shot. She added that the person who shot the dog had to have come from the side and was not facing the dog head on.

She demonstrated the wounds with photographs that were admitted into evidence. She said the bolt came in the left side between the shoulder and the elbow and penetrated through the muscle, damaging the radial nerve. Regarding the radial nerve, she said, "[I]f you've ever hit your funny bone, it sends tingling sensations up and down your arm[,] and then it's hard to use your hand for a few minutes. That's the radial nerve." She said the bolt damaged the radial nerve to the point that for several days afterwards the dog had difficulty placing its feet very well because "he just didn't like the constant tingling in that leg all the time."

Dr. Jones then showed how the bolt "came through the leg and came out through the front of the chest" under the neck. The bolt then "glanced" across the chest deeply enough to cut through some of the muscle. State's exhibit 34 showed a gash about three-and-a-half-inches long and about a half-inch wide

where the skin appears to have split apart. The bolt finished by entering the front part of the right leg and chipping the bone. Dr. Jones said she had to pull out three little pieces of bone.

Dr. Jones asserted the manner in which the dog was shot caused it unjustifiable pain and suffering and constituted illegal torture. She said that it suffered serious bodily injury and could have died without treatment.

Although the dog's injuries were no longer life-threatening when it was adopted a couple weeks later, Dr. Jones said the dog still had some muscle and limb pain in his front legs and still limped slightly. She said the dog had a protracted loss or impairment of his front legs. In her nearly twenty-eight years of veterinary medical practice, this was the first time she had seen an animal who had survived being shot by an arrow.

Because of the publicity about the dog's injuries, survival, and recovery from being shot with a crossbow, there were numerous applications for adoption. A couple fell in love with and adopted the dog while it was still recovering from its injuries. The dog's family now consisted of the couple, their three-month old daughter, and Jack, a Maltese. The dog's owner testified it did not show any aggression whatsoever. The owner said he had no problem with the dog at the dog park near their neighborhood. He said the dog was no longer in pain but still favored one side when it ran.

11

## Extraneous Offense

In his first issue, Appellant contends the trial court abused its discretion by denying his motion for mistrial when a reference was made to an extraneous offense for which Appellant had been found not guilty.

A video recording of Detective Stepp's interview with Appellant was admitted without objection and played to the jury. About twenty minutes into the interview, Detective Stepp said, "You haven't been in trouble for a long time. I know your criminal history out of Georgia. I know your criminal history here." Appellant did not object. About thirty minutes into the interview, Detective Stepp said, "I know you have been down this road before, okay, and I know you got away with it once already. I know that." At this point, Appellant moved for a mistrial because the State had violated his motion in limine.

Outside the presence of the jury, the trial court suggested that it thought any error was not preserved because the evidence came in once before without objection. The State responded that it did not recall that comment being in the interview and suggested an instruction to disregard. The trial court adjourned the jury for the day. When trial resumed the next day, the trial court again suggested it thought any error was waived because, in addition to Appellant's failure to object to the first comment, the video had been admitted without objection. The trial court nevertheless wanted Appellant and the State to work out an instruction. When trial resumed, the trial judge instructed the jury: "You are instructed to disregard any mention of prior history, if any, of the Defendant with regard—

during the interview with Detective Stepp. Such questions were improper and inadmissible and not to be used by you in any way in deciding the verdict in this case."

The State argues that any error is not preserved because the video was admitted without objection. We agree. Although Appellant complained that the State had violated his motion in limine, generally the granting or denial of a motion in limine is a preliminary ruling only and preserves nothing for appellate review. *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003). A defendant must make a timely objection to preserve an error in the admission of evidence. *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995). A party should make an objection as soon as the ground of objection becomes apparent. *Id.* Generally this occurs when the evidence is admitted. *Id.* Consequently, if a question clearly calls for an objectionable response, the party should make the objection before the evidence is admitted. *See id.* If the party fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and the party waives any error. *Id.* At trial, Appellant acknowledged having access to the video for some time and having reviewed it. The trial court noted Appellant had not presented it with any motion to redact the video. A mistrial is not required on the basis of an unpreserved evidentiary complaint. *See Glassey v. State*, 117 S.W.3d 424, 432 (Tex. App.—Fort Worth

13

2003, no pet.) (holding that the appellant failed to preserve error because the evidence came in without objection during another witness's testimony).

Notwithstanding the fact Appellant had not preserved error, the trial court, as noted above, nevertheless gave the jury an instruction to disregard. On appeal, Appellant attacks this instruction to disregard because it was not given immediately and served only to compound the error. *See Rojas v.* State, 986 S.W.2d 241, 250 (Tex Crim. App. 1998) (stating instruction to disregard must be given promptly); *Hagood v.* State, 284 S.W. 547, 547 (Tex. Crim. App. 1925) (stating defendant, by objecting to instruction because it would only compound error, preserved error notwithstanding absence of corrective instruction). At trial, Appellant did not object to the instruction. Just the contrary, absent a mistrial, Appellant favored an instruction to disregard. We hold any error regarding the instruction to disregard was not preserved. Tex. R. App. P. 33.1(a). We hold the trial court did not err by denying Appellant's motion for mistrial or by giving the instruction to disregard and overrule Appellant's first issue.

### Sufficiency of the Evidence

In his second issue, Appellant contends the evidence is insufficient to support his conviction. He stresses the lack of fingerprint or other physical evidence tying him to the shooting. Appellant argues that Ponce was a biased witness and that even Ponce said he only saw Appellant walking with a crossbow.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

The evidence showed Appellant had complained twice about the dog a week before the offense. Appellant acknowledged having owned a crossbow. Ponce saw Appellant with a crossbow only moments after the dog was shot with a bolt from a crossbow. The jury could have reasonably concluded Appellant was the person who shot the dog with a crossbow and could have reasonably disbelieved Appellant's testimony about the crossbow having been stolen and about his use of bolts other than the one that injured the dog. The jury further disbelieved Appellant's purely speculative theory that Ponce lied and accused Appellant in retaliation for Appellant having reported Ponce to the police earlier. It was the jury's prerogative to decide whom to believe. *See Dobbs*, 434 S.W.3d at 170. We may not substitute our judgment for that of the jury. *See Isassi*, 330 S.W.3d at 638. We hold the evidence was sufficient for a rational trier of fact to have found, beyond a reasonable doubt, that Appellant intentionally, knowingly, or recklessly tortured or in a cruel manner killed or caused serious bodily injury to an animal by shooting it with a crossbow. *See Jackson*, 443 U.S. at 319; *Dobbs*, 434 S.W.3d at 170. We overrule Appellant's second issue.

## Conclusion

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 11, 2015