

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00441-CR

ADRIAN QUIGLEY                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

## FROM THE 16TH DISTRICT COURT OF DENTON COUNTY
## TRIAL COURT NO. F15-1130-16

----------

## MEMORANDUM OPINION[1]

----------

In six issues, Appellant Adrian Quigley appeals from his conviction for capital murder and resulting life sentence. We affirm.

## I. BACKGROUND

In April 2015, Richard Myles resided in a small second-floor apartment in the Hampton Bay apartment complex in Lewisville with his fiancée, Katina

---

[1]See Tex. R. App. P. 47.4.

Washington, and their twenty-three-month-old son. The two hoped to marry around Easter the following year, and in order to save money for their wedding, Washington carried two jobs, working approximately forty hours a week at Bank of America and an additional twenty-five hours a week at David's Bridal. Myles had not held a job since January 2015, and whenever Washington was at work, he would look after their son. Although unemployed, Myles found a way to make money—by selling marijuana. He was known to keep a supply of marijuana inside a green bag that he always kept with him, as well as a safe in the apartment's kitchen, in which he stored money.

On the morning of April 7, 2015, Washington went to work at Bank of America. She returned to her apartment in the early afternoon, and at approximately 5:45 p.m., she said goodbye to Myles and left for an evening shift at David's Bridal. A few minutes after her shift ended at 9:00 p.m., Washington checked her cell phone and saw that she had some missed calls and messages from one of her upstairs neighbors, but she did not have an opportunity to listen to her messages before leaving David's Bridal to head back to her apartment. When she arrived at the Hampton Bay apartment complex, Washington saw numerous police cars and officers. She called a neighbor, who handed the telephone to an officer at the scene, and he directed her to return home and ask to speak with him. Washington returned home as instructed, and the officer informed her that Myles had been shot and killed inside their apartment earlier that evening.

2

The shooting had occurred sometime around 7:00 p.m., and several individuals in the area surrounding Myles's apartment heard it take place. One such individual was Robert Turnbow, who lived in the apartment above Myles's. A little after 7:00 p.m., Turnbow was at his apartment with his girlfriend when he heard a loud bang. While Turnbow's girlfriend thought the noise could have been a gunshot, Turnbow initially believed that somebody had kicked in the door of another apartment. He went out to his patio and saw a stocky black male of average height running away from his apartment building toward a parking lot. Turnbow noticed that this individual appeared to be injured in his midsection, that he was holding his hands to his stomach, and that he was holding a bag or jacket in his arms. While still on his patio, Turnbow used his cell phone to dial 911 and reported that his downstairs neighbor's apartment had been broken into.

Myles's downstairs neighbor, Judy Trojacek, was also in her apartment around 7:00 p.m. when she heard two loud thumps coming from the floor immediately above her. She opened her front door to see what was happening and saw a black male run down the stairs toward a parking lot. This individual appeared to be carrying a box or backpack, and bags of marijuana fell to the ground as he fled, though he did not appear to be injured. A few moments later, Trojacek saw another black male run down the stairs and head in the same direction as the first individual. This second individual appeared to be injured, and as he ran, he was picking up the marijuana that the first individual had dropped. Trojacek dialed 911 and reported that there had been a shooting in the

3

apartment above her. While she was on the phone with the 911 operator, officers from the Lewisville Police Department arrived on scene and entered Myles's apartment. They discovered Myles's lifeless body in the living room, and they also discovered Myles and Washington's young child in the back bedroom, seemingly in shock, yet ultimately uninjured.

The investigation of Myles's murder commenced. Inside the apartment, investigators discovered that Myles had a bag of marijuana in his hand and that he had been shot multiple times. They discovered four spent .45-caliber shell casings near his body and in the kitchen. They recovered two .45-caliber bullets in the apartment and two from Myles's body. They found Quigley's blood on the refrigerator and on the back of the apartment's front door. They found Myles's safe open and empty, and aside from the money missing from Myles's safe, the only other item missing from the apartment was Myles's green marijuana-filled bag.

Outside the apartment, a canine unit arrived. After being informed that two suspects had run down the stairs after exiting Myles's second-floor apartment, the canine officers directed their dogs to the bottom of the stairs, where they alerted to a scent and tracked it to the same parking lot that the two suspects had fled toward, at which point the dogs lost the scent. In that parking lot, officers discovered Quigley's blood. And when investigators retraced the route that the dogs had tracked from the bottom of the stairs to the parking lot, they discovered a box of .45-caliber ammunition on the ground, which was missing eight bullets.

4

Investigators interviewed witnesses, who corroborated several of the details Turnbow and Trojacek had provided in their 911 calls and provided some additional ones. The witnesses stated that the two suspects who had fled from Myles's apartment after the shooting ran toward a parking lot. One of the men was running ahead of the other by approximately ten to fifteen seconds, and the second individual was injured and had a bloodstain on his shirt. The two suspects got into a dark-colored car, which was backed into a parking spot, and drove away. A witness provided investigators with the license plate number of the vehicle. Witnesses also informed investigators that Quigley was the injured suspect who had fled from Myles's apartment after the shooting.

The next day, Quigley walked into the Lewisville police station to speak with investigators. His hand was wrapped in a cloth, blood was accumulating on the cloth, and his side was bandaged. Because of his injuries, Quigley was transported by ambulance to the hospital, accompanied by a detective. During the ambulance ride, Quigley told the detective a brief version of what had happened the day before. Quigley said that he had gone to Myles's apartment with an individual named Demico Stanley to sell Myles a quarter-pound of marijuana; that Stanley "just started shooting" and shot him; that he fled to the "country" after Stanley shot him;[2] and that he had come back to tell his side of the story.

---

[2]The evidence reflects that by "country," Quigley meant the "Mexia, Groesbeck, Waco" area.

5

After Quigley was treated and discharged, he returned to the police station, where investigators conducted an interview with him about the shooting inside Myles's apartment. Quigley stated that he and Myles were in the kitchen and Stanley was in the living room. When Myles leaned down to open his safe and pull out his money, Stanley pulled out a gun and pointed it at him and Myles. Quigley said he raised his hands, and Stanley shot him. Then, Myles charged at Stanley, and Stanley fired multiple times at Myles in the living room. Quigley stated that he grabbed Myles's green bag—which he claimed belonged to him— and ran out the front door, leaving Myles and Stanley in the apartment. Quigley claimed that he ran to a neighboring apartment complex, saw a friend who was outside, and told the friend to give him a ride to the country.

Having learned of Stanley's involvement in the shooting, investigators discovered that he had fled to Louisiana. When they picked him up to bring him back to Texas, Stanley decided to talk. He stated that he and Quigley went to Myles's apartment to sell him marijuana, and that while he was in the apartment, Myles grabbed him on the shoulder. Believing that Quigley and Myles were trying to set him up, Stanley pulled a gun out of his bag and accidentally fired one shot, which struck Quigley. Myles grabbed Quigley, pushed him toward Stanley, and then rushed at Stanley. Stanley started shooting and then fled. As he did so, a box of ammunition fell out of his bag. Stanley further stated that he and Quigley both fled to the vehicle they had driven to the apartment complex, got in, and drove to Stanley's apartment. Stanley stated that while he was driving the

6

getaway vehicle, he pulled his gun on Quigley because he thought he was being set up. Once they arrived at Stanley's apartment, Stanley stated that he got out of the car and never saw Quigley again.

Using the license plate number witnesses provided, investigators learned that the vehicle in which Quigley and Stanley had fled the scene was a blue Chevy Cruze owned by Enterprise Rental. They learned that Stanley had asked a friend to rent that vehicle, that he provided her with the money to rent it, and that he told her that he intended to use the vehicle to sell marijuana. They located the vehicle and discovered Quigley's blood on the front passenger seat and the gear shift.

Based upon what they had otherwise learned during the course of the investigation, investigators concluded that Quigley had lied during his first interview. At a second interview, Quigley admitted that he had lied about the green bag belonging to him, about running out of Myles's apartment first, about running to the neighboring apartment complex after the shooting, and about hitching a ride from a friend. He stated that he had actually grabbed Myles's money and green marijuana bag and followed Stanley out of the apartment. For the first time, Quigley claimed that Stanley had forced him to grab Myles's money and green marijuana bag, that he got into the Chevy Cruze with Stanley, and that as they drove to Stanley's apartment, Stanley was threatening him with the gun and asking him why he had set him up. Quigley admitted that at the time he and Stanley went to Myles's apartment, he knew that Stanley had been previously

7

charged with murder and that Stanley associated with individuals who had been charged with murder or who were currently in jail for murder charges.

After Quigley's second interview with investigators, an inmate named William Mark Hill reached out to investigators to discuss a case that was unrelated to Myles's murder. They met with Hill to discuss that unrelated case, and during the interview, Hill provided some information pertinent to the investigation of Myles's murder. Prosecutors followed up with Hill, who told them that Quigley was a good friend of his that he had known for five or six years, and that he had met Myles for the first time the day before he was killed. He stated that on the night before Myles's murder, he drove to pick up Quigley and that they both went to Myles's apartment. Hill stated that his understanding was that Myles wanted to buy a pound of marijuana for $3,000, and that he and Quigley were going to Myles's apartment in order to show Myles a sample of two different kinds of marijuana so that Myles could choose which kind he wanted to purchase. Hill stated that as they drove to Myles's apartment, however, Quigley related his plan to rob Myles and said that he wanted Hill to help him. Specifically, Quigley told Hill that Myles had a gun, so Quigley told Hill that once they got into Myles's apartment, he wanted Hill to immediately knock Myles out by punching him in the jaw, thereby incapacitating him. Hill, however, did not want to rob Myles, so once he and Quigley arrived at Myles's apartment, Hill proceeded to show him two samples of marijuana, Myles chose which kind he wanted, and then Hill and Quigley left. Hill stated that while they were driving

8

away, Quigley was upset with him for not following through with his plan because Quigley's sole intent that day was to rob Myles.

A grand jury indicted Quigley for the offense of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2016). The jury was charged on the offense of capital murder, as well as the lesser-included offenses of murder and robbery. The jury found Quigley guilty of capital murder, and the trial court imposed the statutorily mandated sentence of life imprisonment without parole. *Id.* §§ 12.31(a)(2) (setting punishment at life without parole for a capital felony in cases where State does not seek death penalty and defendant was eighteen years of age or older when he committed the capital felony), 19.03(b) (West Supp. 2016) (providing that offense of capital murder is a capital felony).

## II. SUFFICIENCY OF THE EVIDENCE

In his first and sixth issues, Quigley argues that the evidence is legally and factually insufficient to support his conviction for capital murder or any lesser-included offense. We begin with a brief clarifying discussion of the standard of review for a sufficiency challenge in light of Quigley's sixth issue—his factual-sufficiency challenge.

### A. FACTUAL SUFFICIENCY

In *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010), the court of criminal appeals adopted a factual sufficiency standard of review, which allowed an appellate court to set aside a jury's verdict if, after viewing the evidence in a

9

neutral light, the verdict was "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust[.]" *Brooks*, 323 S.W.3d at 899 n.12 (quoting *Clewis*, 922 S.W.2d at 129). In 2010, however, the court of criminal appeals overruled *Clewis* and held that the standard of review for sufficiency challenges set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 912.

Quigley candidly acknowledges the court of criminal appeals' holding in *Brooks*, and he did not initially make a factual-sufficiency challenge in his brief. However, after he filed his brief, Quigley requested leave to supplement in order to raise a factual-sufficiency challenge because the court of criminal appeals had recently granted review in two companion cases in which the petitioner asked the court of criminal appeals to reconsider its abrogation of a factual-sufficiency review in *Brooks*. *See Walker v. State*, Nos. PD-1429-14, PD-1430-14, 2016 WL 6092523, at *1 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication). Quigley thus sought leave to raise factual sufficiency in the event that the court of criminal appeals reinstated it. We granted Quigley leave to raise his factual-sufficiency issue. The court of criminal appeals has since decided *Walker*, and it did not overrule *Brooks*. *See id.* at *2 n.1 (declining to consider whether to overrule *Brooks*); *see also Garcia v. State*, No. 06-15-00187-CR, 2016 WL

10

6638863, at *1, n.1 (Tex. App.—Texarkana Nov. 10, 2016, no pet.) (mem. op., not designated for publication) (noting that in deciding *Walker*, the court of criminal appeals did not overrule *Brooks*). Thus, the *Jackson* standard remains "the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 912. Consequently, we overrule Quigley's sixth issue.

## B.  LEGAL SUFFICIENCY

We turn now to Quigley's first issue—his legal-sufficiency challenge—and begin by setting forth the appropriate standard of review.  In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).  Thus, when performing an

11

evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray*, 457 S.W.3d at 448. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49.

### 1.  The Law of Capital Murder

As applicable to this case, a person commits the offense of capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. Tex. Penal Code Ann. § 19.03(a)(2). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property he (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a) (West 2011). And a person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. *Id.* § 31.03(a) (West Supp. 2016).

The evidence shows that Myles died from gunshot wounds to the chest and abdomen, and it is undisputed that Stanley, not Quigley, was the person who shot Myles. Nevertheless, the law of parties provides that Quigley could be found guilty of capital murder if Stanley committed a capital murder and Quigley

12

was criminally responsible for Stanley's conduct. *See* Tex. Penal Code Ann. § 7.01(a) (West 2011) (providing that "[a] person is criminally responsible as a party to an offense if the offense is committed . . . by the conduct of another for which he is criminally responsible . . . .").

Here, the jury was instructed that it could find Quigley criminally responsible for Stanley's conduct under two theories. First, under Texas Penal Code section 7.02(a)(2), Quigley could be found criminally responsible for a capital murder committed by Stanley if, acting with intent to promote or assist the commission of the capital murder, Quigley solicited, encouraged, directed, aided, or attempted to aid Stanley in committing that offense. *See* Tex. Penal Code Ann. § 7.02(a)(2) (West 2011). Second, under Texas Penal Code section 7.02(b), Quigley could be found criminally responsible for a capital murder committed by Stanley if Quigley and Stanley had a conspiracy to commit robbery, and in the attempt to carry out that robbery, Stanley committed the capital murder in furtherance of the robbery, and the capital murder should have been anticipated as a result of carrying out the conspiracy. *See id.* § 7.02(b) (West 2011). The jury was instructed that "'[c]onspiracy' means an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense" and also that the existence of an agreement constituting a conspiracy may be inferred from the acts of the parties. *See* Tex. Penal Code Ann. § 15.02(a), (b) (West 2011).

13

The jury, having been instructed on both of these theories, returned a general verdict finding Quigley guilty of capital murder. We will not disturb that verdict if the evidence is sufficient to support it under either theory. *See Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992) ("The principle is well-established that when the jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld.").

## 2. The Evidence Is Sufficient

We turn now to the evidence in this case, which we review in the light most favorable to the jury's verdict. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. Hill testified that the night before Myles's murder, he drove Quigley to Myles's apartment under the impression that Myles wanted to buy a pound of marijuana for $3,000, and that he and Quigley were driving to Myles' apartment that night in order to show Myles a sample of two different kinds of marijuana that he could choose from. Hill testified that as they were driving, Quigley stated that his plan was to rob Myles and asked him to assist in that effort by knocking Myles out once they arrived at his apartment because he had a gun. Quigley explained that once Myles was knocked out, he would then "take whatever [Myles] had." Hill further testified that when he did not help Quigley rob Myles, Quigley became upset with him.

The evidence shows that the very next day, Quigley showed up with Stanley at Myles's apartment, and according to Quigley's own statement to

14

investigators, when Myles bent down to grab his money out of his safe, Stanley pulled a gun out of his bag, pointed it in their direction, and said, "Hey, check this out." In addition, both Quigley and Stanley told investigators that Stanley then fired his gun at Myles, and Dr. Richard Fries, a Tarrant County medical examiner, concluded that Myles's death was caused by gunshot wounds to his chest and abdomen. Quigley also told investigators that after the shooting, he took what Myles had by grabbing Myles's money and green marijuana bag and followed Stanley out of the apartment to the getaway car. Further, Anthony Bryant, a witness who observed Stanley and Quigley running from Myles's apartment after the shooting, testified that when Stanley and Quigley were running toward their getaway car, Quigley trailed Stanley by ten to fifteen seconds. Finally, Lewisville Police Department Detective Scott Kelly testified that Quigley told him that before he and Stanley went to Myles's apartment on April 7, 2015, he was aware that Stanley had previously been charged with murder and that Stanley associated with other individuals who either had been previously charged with murder or were in jail for murder charges.

With respect to the State's section 7.02(b) theory of party responsibility, Quigley primarily attacks the sufficiency of the evidence on two grounds. First, he argues that the evidence is insufficient to show that he and Stanley had a conspiracy to rob Myles. However, we conclude that a rational jury could have inferred from the evidence that when Hill refused to assist Quigley with his plan

15

to rob Myles on April 6, 2015, Quigley successfully enlisted Stanley's assistance to accomplish the same end the very next day.

Second, Quigley argues that the evidence is insufficient to show that he should have anticipated that a capital murder could occur as a result of carrying out the conspiracy. He contends, and the State concedes, that the facts of this case are similar to the facts in *Tippitt v. State*, 41 S.W.3d 316 (Tex. App.—Fort Worth 2001, no pet.), *abrogated on other grounds by Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007). As in this case, the jury in *Tippitt* was instructed that it could find the defendant, Preston Tippitt, guilty of capital murder as a party under either section 7.02(a)(2) or section 7.02(b) of the penal code, and the jury returned a verdict finding him guilty of capital murder. *See id.* at 323. The evidence showed that Tippitt formulated a plan with Robert Whitaker, a person whose reputation suggested might be prone to commit violence, to rob a drug dealer at his house. *Id.* at 319–20, 325. The two showed up at the drug dealer's house, and Whitaker and the drug dealer began transacting business in the kitchen. *Id.* at 320. Then, Whitaker shot the drug dealer, who died as a result. *Id.* Once the shooting started, Tippitt fled. *Id.* We concluded that the evidence was insufficient to find Tippitt guilty of capital murder as a co-conspirator under section 7.02(b) because it failed to show that he should have anticipated that a murder could result from carrying out the robbery. *Id.* at 324–26. Quigley argues that *Tippitt* compels the same conclusion here.

*Tippitt*, however, is not on point. There, in concluding that the evidence was insufficient to prove that Tippitt should have anticipated that a murder could occur as a result of carrying out the robbery, we stated as follows:

> While there was some evidence in our record that, by his reputation, Whitaker might be prone to commit violence, there was no evidence to establish [Tippitt's] knowledge of Whitaker's violent propensities. Moreover, there is no evidence to show that [Tippitt] knew Whitaker had a gun when he entered [the drug dealer's] home. Without such evidence, we cannot hold that the evidence showed, beyond a reasonable doubt, that [Tippitt] should have anticipated intentional murder as a possible result of their agreement to rob [the drug dealer].

*Id.* at 325–26. Here, however, there is evidence in the record showing not only that Stanley had a reputation suggesting that he might be prone to commit violence but also that Quigley knew of Stanley's violent propensities prior to Myles's murder. Specifically, Detective Kelly testified that Quigley told him that before Myles's murder, he knew that Stanley had been charged with murder and that Stanley associated with others who either had been charged with murder or were currently in jail for murder charges. In addition, Hill testified that when Quigley asked him to knock Myles out the day before Myles was killed, it was because Quigley knew that Myles had a gun. Thus, unlike in *Tippitt*, we conclude that there is evidence from which a rational jury could have concluded that Quigley should have anticipated that a capital murder could have occurred as a result of carrying out the conspiracy to rob Myles.

In sum, viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that the jury could have reasonably concluded that

17

(1) Quigley sought to enter into a conspiracy with Hill to rob Myles on April 6, 2015, and when Hill refused to go along with the plan, Quigley then successfully entered into a conspiracy with Stanley to help him rob Myles the following day; (2) in the attempt to carry out that robbery, Stanley shot and killed Myles; (3) Stanley shot and killed Myles in furtherance of the robbery; and (4) Quigley should have anticipated that Myles's murder could have resulted from carrying out the conspiracy to rob him. *See* Tex. Penal Code Ann. § 7.02(b)*.* Thus, we hold that the evidence is sufficient to support the jury's verdict finding Quigley guilty of capital murder as a co-conspirator under section 7.02(b). *See id.* We therefore overrule Quigley's sixth issue.

## C. QUIGLEY'S AFFIRMATIVE DEFENSE OF DURESS

In his fifth issue, Quigley raises a factual sufficiency challenge to the jury's implied finding rejecting his affirmative defense of duress. Duress is an affirmative defense to prosecution. Tex. Penal Code Ann. § 8.05(a)–(b) (West 2011); *see Williams v. State*, 911 S.W.2d 191, 195 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). As applicable to this case, "[i]t is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." Tex. Penal Code Ann. § 8.05(a).

Having already concluded that the evidence is sufficient to support the jury's verdict finding Quigley guilty of the capital murder of Myles committed by Stanley under the conspiracy theory of the law of parties, we frame our analysis

18

of Quigley's duress defense with that holding in mind. *See* Tex. Penal Code Ann. § 7.02(b). The focus of a duress defense is on the "proscribed conduct" that a defendant engaged in. *See* Tex. Penal Code Ann. § 8.05(a). Here, in arguing that the evidence is factually insufficient to support the jury's implied rejection of his duress defense, the proscribed conduct that Quigley specifically focuses on is committing or attempting to commit robbery. He argues that the evidence showed that everything he did after Stanley shot Myles—including taking Myles's money and marijuana and fleeing the apartment—he did under threat of being shot by Stanley, and for this reason, the jury's implicit rejection of his duress defense was so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015).

Under the conspiracy theory of the law of parties, the State had to prove that (1) Quigley entered into a conspiracy with Stanley to rob Myles, (2) Stanley committed capital murder, (3) Stanley committed the capital murder in furtherance of the conspiracy to rob Myles, and (4) Quigley should have anticipated that capital murder could occur as a result of the robbery. *See* Tex. Penal Code Ann. § 7.02(b); *Canfield v. State*, 429 S.W.3d 54, 66 (Tex. App.— Houston [1st Dist.] 2014, pet. ref'd). As detailed above, based upon the evidence presented, the jury could have reasonably believed that Quigley entered into a conspiracy with Stanley to rob Myles, and that he should have anticipated that a capital murder could occur as a result of carrying out that conspiracy. We

19

therefore conclude that the jury's implied finding rejecting Quigley's duress defense was not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Butcher*, 454 S.W.3d at 20. We overrule Quigley's fifth issue.

## III. MOTION FOR MISTRIAL

In his second issue, Quigley argues that the trial court reversibly erred by denying his motion for mistrial. During trial, the State called Lewisville Police Department Detective Shawn Dority, and during his direct examination, it moved to admit Exhibit 67, which included a video of an interview that Detective Dority conducted with Quigley after he had been released from the hospital. The record shows that defense counsel responded, "No objection, Judge. And for the record, I've been provided this [exhibit] well in advance of today." The trial court admitted Exhibit 67. When the State later requested to publish a portion of Exhibit 67 to the jury, the following exchange took place:

> [State]: May I publish, Your Honor, a portion of State's Exhibit 67? I talked to Defense about that, about a number of different things, including that it is two hours long. So we're only going to publish the first hour, not only for time['s] sake, but nothing really happens in the second hour.
>
> So may I publish the first 50 minutes of State's Exhibit 67?
>
> [Defense Counsel]: Judge, we have discussed this. Again, I've had a copy of this for many months prior to today. We do have an agreement as to portions that we will make sure are redacted, and so insofar as we comply with that, then we have no objection.
>
> The Court: Okay.

20

[Defense Counsel]: And [the State] has noted down those times and will be in charge of that. We'll be okay with that.

The Court: Okay. So the Court will allow you to publish State's Exhibit 67, the 50 minutes that you've identified with the agreed-to redactions.

[State]: Thank you, Your Honor.

[Defense Counsel]: Judge, I guess just for clarity['s] sake, we are not objecting to the 50 minutes that are going to be played, including the redactions being admitted into evidence. Anything more than that we would object to the things that we have agreed that are not admissible.

The Court: All right. And I understand your objections.

[State]: That's fine, Your Honor.

The State then showed the video of Detective Dority's interview with Quigley to the jury. After the video finished playing, the State resumed its direct examination of Detective Dority, which filled an additional twenty pages in the record before the trial court dismissed the jury for a break.

While the jury was gone, Quigley moved for a mistrial based upon a statement that Detective Dority had made to Quigley in the video interview that had been played for the jury. That statement, as related by Quigley's counsel, was, "I know you've [Quigley] been locked up for robbery; I know you've been down before." Before opening statements, the trial court had granted Quigley's motion in limine, which included a provision prohibiting the State and its witnesses from "[a]ny mention of or reference to [Quigley's] prior criminal record" before first approaching the bench for a ruling on the admissibility of such

21

matters. Quigley argued that because Detective Dority's statement in the video violated its limine order, the trial court should order a mistrial. Then the following exchange took place:

> The Court: Okay. And so the record is clear, that was Exhibit 67 that was being played?
>
> [Defense Counsel]: Yes, Judge. 67.
>
> The Court: Okay. And as I recall, it was admitted with stipulations that there were going to be certain portions redacted. Was the part that [Defense Counsel] is referring to the part that was agreed to be redacted?
>
> [Defense Counsel]: It was not, Your Honor.
>
> The Court: Okay. So I would then, obviously a motion in limine does not preserve a later objection. I'm going [to] say that that objection was waived because the exhibit had been reviewed previously by Defense, and there was no objection made to that portion of the video before it was played to the jury. So I will overrule the Defense motion for mistrial.

Quigley contends that the trial court abused its discretion by overruling his motion for mistrial.

We first consider the State's argument that Quigley failed to preserve this issue for our review. Generally, a party must preserve an issue in the trial court in order to raise it on appeal, and an appellate court should not address the merits of an issue that has not been preserved. Tex. R. App. P. 33.1(a); *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). To preserve an issue for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they

22

are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013).

The record shows that Quigley affirmatively stated that he had no objection to the trial court admitting Exhibit 67, which included Detective Dority's interview with him. It was not until the State moved to publish the first fifty minutes of that interview to the jury that Quigley noted that the State had agreed to redact certain portions of it. However, he had no objection to the State publishing the un-redacted portions. The record further shows that the particular statement Quigley claimed violated the limine order was not covered by the redaction agreement. And the record reflects that Quigley did not object to that statement at the time it was played to the jury.

Generally, to be timely, an objection must be made as soon as the basis for the objection becomes apparent. *See* Tex. R. Evid. 103(a)(1); Tex. R. App. P. 33.1(a)(1); *London v. State*, 490 S.W.3d 503, 507 (Tex. Crim. App. 2016); *Reyes v. State*, 361 S.W.3d 222, 228–29 (Tex. App.—Fort Worth 2012, pet. ref'd). With respect to the admission of evidence, this normally occurs at the time the evidence is admitted. *Swilley v. State*, 465 S.W.3d 789, 795–96 (Tex. App.— Fort Worth 2015, no pet.) (citing *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex.

Crim. App.), *cert. denied*, 516 U.S. 832 (1995)). Quigley did not raise any objection related to the particular statement forming the basis of his motion for mistrial until well after it had been admitted into evidence and played for the jury. Moreover, Quigley's complaint that the trial court abused its discretion in denying his motion for mistrial is based on the alleged violation of the trial court's limine order. But it is well settled that the granting or denial a motion in limine does not preserve error. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008); *Swilley*, 465 S.W.3d at 795–96 ("Although Appellant complained that the State had violated his motion in limine, generally the granting or denial of a motion in limine is a preliminary ruling only and preserves nothing for appellate review."). Rather, to preserve error as to the subject of a motion in limine, a party must object at the time the subject is raised during trial. *Fuller*, 253 S.W.3d at 232; *Wilson v. State*, 44 S.W.3d 602, 606–07 (Tex. App.—Fort Worth 2001, pet. ref'd); *see Doucette v. State*, No. 03-10-00176-CR, 2011 WL 832129, at *1–2 (Tex. App.—Austin Mar. 9, 2011, no pet.) (mem. op., not designated for publication) (holding that appellant failed to preserve complaint that portions of audio recording published to jury violated trial court's order in limine where appellant failed to object when the audio recording was admitted, failed to object when State asked to publish it to the jury, and failed to object when the challenged statements were played). Because Quigley failed to timely object, we conclude that he failed to preserve his second issue. *See* Tex. R. Evid. 103(a)(1); Tex. R.

24

App. P. 33.1(a)(1); *London*, 490 S.W.3d at 507; *Swilley*, 465 S.W.3d at 795–96; *Reyes*, 361 S.W.3d at 228–29. We therefore overrule Quigley's second issue.

## IV. CHARGE ERROR

In his third issue, Quigley argues that the trial court erred by submitting a charge that authorized the jury to convict him on a theory that was not alleged in the indictment. The penal code provides three distinct theories under which a person can be convicted of murder. *See* Tex. Penal Code Ann. § 19.02(b). Under section 19.02(b)(1), a person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1). Under section 19.02(b)(2), a person commits murder if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *Id.* § 19.02(b)(2). And under section 19.02(b)(3), a person commits murder if he

> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

*Id.* § 19.02(b)(3). The trial court's instruction defining murder in the abstract portion of the charge included all three of these theories.

The jury convicted Quigley of capital murder, and as applicable to this case, "[a] person commits [capital murder] if the person commits murder as defined under *Section 19.02(b)(1)* and the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery[.]" *Id.*

25

§ 19.03(a)(2) (emphasis added). Quigley argues that because the indictment alleges that he committed capital murder, which requires a finding that he committed murder specifically under section 19.02(b)(1), providing an instruction on the definition of murder in the abstract portion of the charge that included the definitions of murder under sections 19.01(b)(2) and 19.01(b)(3) was error that resulted in egregious harm.

Quigley made no objection to the jury charge. Thus, he can prevail on his jury-charge-error complaint only if (1) the charge was erroneous and (2) he suffered egregious harm. *See Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). We do not decide whether the murder instruction in the abstract portion of the charge was erroneous because we conclude that even assuming it was, Quigley was not egregiously harmed.

The charge contains three application paragraphs related to the offense of capital murder authorizing the jury to convict Quigley for that offense as a principal under section 19.03(a)(2), as a party under section 7.02(a)(2), and as a co-conspirator under section 7.02(b), respectively. Each of these paragraphs correctly contained the theory of murder set forth in section 19.01(b)(1), and none of them included the section 19.01(b)(2) or section 19.01(b)(3) theories of murder. Although the charge also included application paragraphs for the lesser-

26

included offense of murder, each of which included all three theories of murder contained in section 19.01(b), it specifically instructed the jury to consider those paragraphs only if (1) it did not believe beyond a reasonable doubt that Quigley was guilty of capital murder, or (2) it had a reasonable doubt that he was guilty of capital murder, or (3) it found that he "engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another."

Because the application paragraphs relating to capital murder correctly instructed the jury on that offense, any error in instructing the jury on all three theories of murder in the abstract portion of the charge did not result in egregious harm. *See Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) ("Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious."), *cert. denied*, 529 U.S. 1102 (2000); *Bazanes v. State*, 310 S.W.3d 32, 39 (Tex. App.—Fort Worth 2010, pet. ref'd). Similarly, because the jury convicted Quigley of the greater offense of capital murder, it had no occasion to consider the lesser-included offense of murder, and consequently, any error in instructing the jury on all three theories of murder in the application paragraphs relating to that lesser-included offense was not egregious. *See Clark v. State*, 717 S.W.2d 910, 917–18 (Tex. Crim. App. 1986) (holding that where jury convicted defendant of greater offense, "errors in the charge on the lesser included offense, for which the appellant was not convicted, could not so have misled the jury as to constitute fundamental error." (quoting

*Thomas v. State*, 587 S.W.2d 707, 708–09 (Tex. Crim. App. 1979))); *see also Saunders v. State*, 913 S.W.2d 564, 569–70 (Tex. Crim. App. 1995) (recognizing that *Clark* court held that "any error in the lesser included offense instruction was not fundamental in view of the fact that the jury convicted [the appellant] of the greater offense of capital murder"); *Tennison v. State*, No. 05-11-01431, 2013 WL 3353329, at *1–2 (Tex. App.—Dallas Jun. 28, 2013, pet. ref'd) (not designated for publication) (holding that appellant was not egregiously harmed because "[w]hen the jury convicted appellant of the greater offense of aggravated assault, the verdict nullified any harm in the lesser included offense portion of the charge"). We overrule Quigley's third issue.

## V. SPEEDY TRIAL

In his fourth issue, Quigley claims that he was denied his right to a speedy trial. We analyze a speedy-trial complaint by applying the balancing test established in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972). *See id.* at 530–33, 92 S. Ct. at 2192–93 (setting forth factors to apply in evaluating a speedy-trial claim under federal Constitution); *Zamorano v. State*, 84 S.W.3d 643, 647–48 (Tex. Crim. App. 2002) (stating that a speedy-trial claim under Texas constitution is analyzed under the factors established in *Barker*). The *Barker* test requires us to weigh the strength of each of the following factors and to balance their relative weight in light of the conduct of the prosecution and the defendant: (1) the length of the delay, (2) the reason for the delay, (3) the circumstances surrounding the appellant's assertion of his speedy-trial right, and

28

(4) the prejudice suffered by the appellant. *Zamorano*, 84 S.W.3d at 647–48; *Murphy v. State*, 280 S.W.3d 445, 450 (Tex. App.—Fort Worth 2009, pet. ref'd).

The court of criminal appeals has made plain that a speedy-trial complaint is, like most appellate complaints, subject to the rules of error preservation. *Henson v. State*, 407 S.W.3d 764, 766, 769 (Tex. Crim. App. 2013), *cert. denied*, 134 S. Ct. 934 (2014); *Denstitt v. State*, No. 02-14-00172-CR, 2015 WL 4043285, at *2–3 (Tex. App.—Fort Worth Jul. 2, 2015, no pet.) (mem. op., not designated for publication); *see* Tex. R. App. P. 33.1(a). One of the reasons underlying the rule requiring a speedy-trial complaint to be preserved is that "[a]t least two of the *Barker* factors (the reason for delay and the prejudice to the accused) are fact-specific inquiries and may not be readily apparent from the trial record," and therefore requiring an appellant to preserve a speedy-trial complaint "enables the [trial] court to hold a hearing and develop this record so that the appellate courts may more accurately assess the claim." *Henson*, 407 S.W.3d at 769.

Here, Quigley filed a motion for speedy trial on June 19, 2015, but we have found nothing in our record showing that he presented it to the trial court, that the trial court held a hearing on it, or that the trial court made a ruling on it. *See* Tex. R. App. P. 33.1(a)(2) (providing that in order to preserve error, a party must either obtain a ruling on his request, objection, or motion, or if the trial court refuses to rule, object to the trial court's refusal to rule); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013) ("To preserve an issue for appellate

review, . . . the trial court must have ruled on the objection either expressly or implicitly.") Consequently, the trial court had no opportunity to develop the evidence pertinent to an analysis under the *Barker* test. *See Henson*, 407 S.W.3d at 769; *Nguyen v. State*, 506 S.W.3d 69, 78 (Tex. App.—Texarkana 2016, pet. filed) (holding speedy-trial complaint not preserved where appellant filed motion for speedy trial but failed to obtain a ruling on it); *see also Grimaldo v. State*, 130 S.W.3d 450, 454 (Tex. App.—Corpus Christi 2004, no pet.) (holding speedy-trial complaint not preserved when appellant fails to raise it before trial begins, when he fails to present evidence of the claim to the trial court, or when he fails to obtain a ruling after presentation of evidence of the claim). We conclude that Quigley failed to preserve his fourth issue.[3] We therefore overrule Quigley's fourth issue.

---

[3]Assuming that Quigley did preserve this issue, however, he still would not prevail. In applying the *Barker* test, we begin with the first factor—the length of delay, which in this case we measure from the time Quigley was arrested until the time his trial commenced. *See Gonzales v. State*, 435 S.W.3d 801, 809 (Tex. Crim. App. 2014). Unless we conclude this delay is presumptively prejudicial, we need not conduct further analysis of a speedy-trial claim. *See Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008); *Schenekl v. State*, 996 S.W.2d 305, 312 (Tex. App.—Fort Worth 1999), *aff'd*, 30 S.W.3d 412 (Tex. Crim. App. 2000). Here, Quigley was arrested on April 8, 2015, and his trial commenced on October 26, 2015, a delay of less than seven months. This delay falls outside of the general rule that a delay exceeding eight months is presumptively prejudicial. *See Russell v. State*, 90 S.W.3d 865, 872 (Tex. App.—San Antonio 2002, pet. ref'd) (stating that "[g]enerally, a delay of eight months or longer is considered 'presumptively prejudicial' and triggers speedy trial analysis"); *Schenekl*, 996 S.W.2d at 312 (same). We cannot say that the delay in this capital-murder case "crossed the threshold dividing 'ordinary' from 'presumptively prejudicial' delay[.]" *Zamorano*, 84 S.W.3d at 649 (citing *Doggett v. United States*, 505 U.S. 647, 651–52, 112 S. Ct. 2686, 2690–91 (1992)).

## VI. CONCLUSION

Having overruled all of Quigley's issues, we affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 9, 2017

---

Thus, even had Quigley preserved his speedy-trial complaint, he nevertheless would not prevail on his fourth issue.