

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00187-CR

_____

LYNYRD LEVI ESTRADA, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1514117D

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

A jury convicted Appellant Lynyrd Levi Estrada of aggravated assault with a deadly weapon, and the trial court sentenced him to twenty-five years' confinement. In three issues, Estrada complains that the trial court abused its discretion by admitting evidence of criminal activity he engaged in minutes before the incident for which he was convicted; that the trial court erred by failing to include a limiting instruction in the jury charge regarding that challenged evidence; and that the trial court violated his right to due process by admitting evidence regarding the complainant's pretrial and in-trial identification of Estrada because the lineup procedure was so impermissibly suggestive that it tainted the subsequent in-court identification. We hold that the trial court did not reversibly err, overrule Estrada's three issues, and affirm the trial court's judgment.

## I. Background Facts

In mid-September 2017, Officer Nicholas Maddock, dressed in his Fort Worth Police Department tactical uniform, was working an off-duty security job at a River Oaks bar off Jacksboro Highway. A large fight broke out on the dance floor shortly before the 2:00 a.m. closing time. He and another officer began telling people to leave and breaking up the fight. Someone grabbed Officer Maddock's shoulder. When he turned around, he saw Estrada and his adult son. Officer Maddock told them to leave; they refused, so Officer Maddock and his partner escorted them outside. Estrada, who appeared to be drunk, struggled and resisted. Officer Maddock decided to arrest

him for public intoxication and ordered him to the ground. Estrada refused and took a "fighting stance." Officer Maddock hit Estrada's left knee twice with his baton. Estrada's son then threw a pocketknife at Officer Maddock, cutting his right leg. During that diversion, Estrada started walking toward the highway. He resisted Officer Maddock's commands to stop and to get on the ground, so Officer Maddock Tased him. Estrada fell to the ground. Estrada's son then threw a concrete rock at Officer Maddock, hitting him on the head. Estrada's son ran southbound on Jacksboro Highway, and Officer Maddock and his partner followed. When Officer Maddock left, the Taser wires connecting Officer Maddock's Taser and its probes broke, freeing Estrada. Officer Maddock did not see Estrada again that night.

Estrada went to his car and tried to drive out of the bar's parking lot. He honked at the car in front of him and said, "Move, move, move!" loudly enough that the driver of that car—the complainant Rojelio Escobar—heard him. However, Escobar could not go anywhere yet because the police were controlling outbound traffic. Estrada's car rear-ended Escobar's. When Escobar exited his car to assess the damage, Estrada drove around him, and as Escobar watched, Estrada left the parking lot and went to the gas station across the highway.

Escobar returned to his car, which was also occupied by his girlfriend. When the police allowed him to leave the parking lot, he pursued Estrada to get insurance information. After Escobar parked near Estrada at the gas station, Estrada told Escobar that Rachel Martinez, Estrada's wife, had insurance on the vehicle and would

3

be there shortly. The two men stood outside and talked calmly. Meanwhile, a friend of Escobar's girlfriend had seen the collision. That friend drove to the gas station to check on Escobar's girlfriend and took a picture of Estrada's license plate. A few minutes later, Martinez, Estrada's sister, her boyfriend, and a male friend of his arrived at the gas station in a red truck and quickly got out of the vehicle. Estrada suddenly punched Escobar in the neck. The group from the red truck and Escobar's girlfriend joined in the fight. Escobar defended himself, throwing punches at everyone who "got in front of" him as he moved backward.

During the fight, after his breathing became difficult, Escobar realized that he had been stabbed in his ribcage area. Still fighting, he soon found that he could not lift his arm; he then saw a lot of blood and realized that he had also been stabbed in his arm. Escobar ran across the highway to get help from the police, who were still in the bar's parking lot. Only ten to fifteen minutes had elapsed since Officer Maddock's confrontation with Estrada.

Estrada left the gas station with Martinez. After they were in the car, he admitted to her that he had stabbed Escobar during the fight. She testified at trial that Estrada had stabbed Escobar only after Escobar had punched her in the neck, knocking her to the concrete pavement.

The day after the assault, Escobar described his attacker to River Oaks Detective Nathan Wilson. Two days after the assault, Detective Wilson presented a photographic lineup to Escobar. The lineup did not contain Estrada's photograph,

4

and Escobar did not identify anyone. On the following morning, Detective Wilson and his partner, Detective Whitley, showed Escobar another photographic lineup. This one included Estrada's photograph. Viewing the six photographs sequentially, Escobar showed a great deal of interest in the fourth photograph—Estrada's photograph. After the detectives showed Escobar the next two photographs, he compared the fourth and fifth photographs briefly and soon decided, with a 60–70% certainty, that Estrada's photograph portrayed the attacker. Some of Escobar's testimony in the suppression hearing indicated that a few minutes after he identified Estrada's photograph, Escobar heard Wilson say that Escobar had picked "the right guy" and that the police had chosen the wrong suspect for the first lineup, although Escobar gave conflicting testimony on this point. Based solely on the time he spent with Estrada during the assault and not on the photographic lineup, Escobar identified Estrada at trial as his attacker.

## II. Discussion

### A. Challenge to Admissibility of Extraneous-Offense Evidence Forfeited

In his first issue, Estrada complains about the admission of evidence concerning his interactions with Officer Maddock before the fight with Escobar at the gas station. We hold that Estrada did not preserve this issue.

Because it is a systemic requirement, this court should independently review error preservation, and we have a duty to ensure that a claim is properly preserved in the trial court before we address its merits. *Darcy v. State*, 488 S.W.3d 325, 327–

5

28 (Tex. Crim. App. 2016). To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013).

Motions in limine do not preserve error. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("A motion in limine . . . is a preliminary matter and normally preserves nothing for appellate review. For error to be preserved [regarding] the subject of a motion in limine, an objection must be made at the time the subject is raised during trial." (citation and emphasis omitted)); *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007). This is true whether the motion is granted or denied. S*ee Griggs v. State*, 213 S.W.3d 923, 926 n.1 (Tex. Crim. App. 2007); *Swilley v. State*, 465 S.W.3d 789, 795 (Tex. App.—Fort Worth 2015, no pet.). The party must object when the evidence is offered at trial. *Fuller*, 253 S.W.3d at 232; *Roberts*, 220 S.W.3d at 533.

Before trial, Estrada filed a motion in limine regarding "[a]ny reference to other wrongs, acts, or crimes [he] allegedly" committed that were not charged in the indictment. The State argued, however, that Officer Maddock's identification of Estrada as having been present at the bar across the street from and within minutes of

the assault corroborated Escobar's identification of Estrada as his attacker. In a

pretrial hearing, the trial court ruled on the motion:

> Defense has made a motion in limine about anything related to that first event[ (the altercation between Officer Maddock and Estrada at the bar)]. I'm going to allow the State, based on the proffer of the parties and the timing and detailed discussions, [to put on evidence] that [Estrada] was present catty-cornered across the street of Jacksboro Highway from the location of the offense within minutes of the actual offense taking place, but I will limine the details of any confrontation, physical confrontation, belligerent behavior, at least upfront, but depending on when you call that witness and what the status of the record is, I may change that ruling. But it sounds like—the court reporter told me there was voir dire on self-defense. It could be at some point, where first aggressor or other issues are involved, that [Estrada's] state of mind . . . having an unrelated conversation minutes before may be relevant to what happened at the scene, but I have no idea with an empty record what did or didn't happen at the scene of the alleged assault.
>
> So I will limine it for now and then I will decide later based on the scope of cross, based on any defensive theories, based on what I hear from the witnesses present at the location of the event detailed in the indictment on how far into the details of the prior incident are properly before this jury on the assault [Estrada is] charge[d with committing] against [the complainant Escobar], not evading arrest or interfering with the duties of some officer that's not named as the victim in this indictment.
>
> . . . .
>
> So I'm not making an ultimate evidentiary ruling; I'm making a limine ruling for now.

Before Officer Maddock testified as the State's last witness in its case-in-chief,

the prosecutor asked the court for clarification on the ruling. The trial court excluded

7

the evidence for the time being, but left open the possibility that it could be admitted later in the trial, ruling:

> [I]f there's anything you [the State] think you need to do or have to do or want to do or otherwise, depending on what the Defense does and the state of the record, you can certainly re-open or rebut and bring in things that change[] the state of the record.
>
> I know everyone voir dires on it, . . . but as of now, what's in the record, I do not see anything raising a self-defense to deadly force case . . . . There has to be self-defense use of deadly force to prevent the use of—unlawful use of deadly force against yourself or another, you have a duty to protect or choose to under the circumstances and as of right now, there are things there—there are bits and pieces of a jigsaw puzzle that if we had a charge conference now, if that affects what you want to do or need to make a record, there isn't a self-defense charge at this point. I know they've asked for it from the get-go, but as of now I don't see it. But it's still the State's case and the Defense hasn't even started their case, but as of now there's not.
>
> . . . .
>
> I will say as of now, based on the state of the record, the quality of the evidence, based on what I was going to allow to put him at the scene, based on the evidence that's been now offered in, I find the 403 impact of that is—outweighs any probative value on the identi[t]y issue.
>
> However, like you said earlier on the self-defense issue, if that is raised such then—if they put on evidence and when they rest and my answer to the self-defense charge changes, I'll allow you to address that evidence without an ID [identification] hearing because ID will be a moot point.
>
> . . . .
>
> Because to put on self-defense, someone's going to have to say he, not some other person, that they're 50 percent sure who it is, acted without legal justification, not some other person.

Defense counsel did not say anything in this discussion.

8

Officer Maddock's testimony during the State's case-in-chief focused on his encounter with Escobar after the stabbing. Then the defense put on Martinez's testimony, raising the issue that Estrada had stabbed Escobar in her defense. After the defense rested its case-in-chief, the State called Officer Maddock as a rebuttal witness. He testified—without objection—about his interactions with Estrada that occurred in and outside the bar across the highway only minutes before the aggravated assault at the gas station.

Estrada did not object to the trial court's preliminary evidentiary ruling that Maddock could testify about Estrada's conduct at the bar if the defense put on evidence raising self-defense or defense of a third person, nor did Estrada object to Maddock's testimony on rebuttal. Accordingly, we hold that Estrada forfeited his appellate complaint regarding the admission of evidence concerning his interactions with Officer Maddock before the fight with Escobar at the gas station. *See* Tex. R. App. P. 33.1(a); *see, e.g.*, *Pina v. State*, No. 03-17-00129-CR, 2018 WL 1547272, at *3 (Tex. App.—Austin Mar. 30, 2018, no pet.) (mem. op., not designated for publication); *Turner v. State*, No. 02-13-00487-CR, 2015 WL 4775758, at *8 (Tex. App.—Fort Worth Aug. 13, 2015, pet. dism'd, untimely filed) (mem. op., not designated for publication). We overrule Estrada's first issue.

### B. Proper Omission of Limiting Instruction from Jury Charge

In his second issue, Estrada complains that the trial court erred by failing to include a limiting instruction in the guilt–innocence jury charge regarding Officer

9

Maddock's testimony about his interactions with Estrada in and outside the bar. Estrada did not request a limiting instruction when the evidence was admitted. A trial court does not err by failing or refusing to give a limiting instruction on extraneous-offense evidence in the guilt–innocence jury charge if the defendant did not request a limiting instruction when the trial court admitted the evidence. *Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007); *Gunter v. State*, 327 S.W.3d 797, 802 (Tex. App.—Fort Worth 2010, no pet.) (applying *Delgado* to hold that appellant forfeited his complaint on appeal). When the defendant does not timely request a limiting instruction, the evidence is admitted for all purposes. *Delgado*, 235 S.W.3d at 251 (explaining that to hold otherwise would allow the jury to sit through most of the trial under the mistaken belief that certain evidence is admissible for all purposes when, in fact, it is not). We overrule Estrada's second issue.

### C. Admissible Photographic Lineup and In-Court Identification

In his third issue, Estrada contends that the trial court violated his right to due process under the United States Constitution by denying his motion to suppress and admitting (1) evidence regarding the second photographic lineup shown to Escobar and (2) Escobar's in-court identification of Estrada as his attacker because the lineup procedure was so impermissibly suggestive that it tainted Escobar's in-court identification.

10

## 1. Substantive Law and Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818. When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling and then apply the same two-pronged review to the implied findings and legal rulings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Kelly*, 204 S.W.3d at 819; *see Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

Estrada's motion to suppress challenged the reliability and admissibility of Escobar's pretrial and in-court identification of Estrada. As the Texas Court of Criminal Appeals has explained, the issue of reliability is usually a credibility determination for the jury:

> Generally, the Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting its introduction, but by affording the defendant the means to persuade the jury that the evidence should be discounted as unworthy of credit. The Due Process Clause bars the admission of identification evidence only when the introduction of such evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."

*Balderas v. State*, 517 S.W.3d 756, 791 (Tex. Crim. App. 2016) (footnotes omitted) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 237, 132 S. Ct. 716, 723 (2012)). To prove a due-process violation, the defendant bears the burden of establishing by clear and convincing evidence that (1) the pretrial identification procedure (here, the second photographic lineup) was impermissibly suggestive, and (2) the procedure was unreliable; that is, it created a very substantial likelihood of irreparable misidentification. *Id.* at 792, 796; *Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim. App. 1995); *Mendiola v. State*, 269 S.W.3d 144, 146 (Tex. App.—Fort Worth 2008, no pet.). When the defendant fails to prove the first prong, appellate courts are not required to review whether the procedure was reliable. *See Barley*, 906 S.W.2d at 34; *Mendiola*, 269 S.W.3d at 146.

Suggestiveness may stem from the way the police conducted the lineup or from the contents of the photographic array. *Barley*, 906 S.W.2d at 33; *McGuire v. State*,

12

No. 14-18-00403-CR, 2020 WL 1887631, at *3 (Tex. App.—Houston [14th Dist.] Apr. 16, 2020, no pet.); *Gilmore v. State*, 397 S.W.3d 226, 237 n.15 (Tex. App.—Fort Worth 2012, pet. ref'd). A single procedure or photograph may result in a suggestive identification, or a suggestive identification may be the cumulative effect of multiple procedures or photographs. *Barley*, 906 S.W.2d at 33; *McGuire*, 2020 WL 1887631, at *3.

If a trial court decides that a pretrial lineup was impermissibly suggestive, it must then determine the reliability of the subsequent pretrial or in-court identification under the totality of the circumstances. *Balderas*, 517 S.W.3d at 792. The court determines reliability by weighing the following "five non-exclusive factors against the corrupting effect" of the pretrial photographic lineup: (1) the witness's chance to observe the suspect during the offense; (2) the level of attention the witness paid to the suspect during the offense; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty with which the witness identified the suspect; and (5) the time lapse between the offense and the identification. *Id.* If the indicia of reliability outweigh the corrupting influence of an impermissibly suggestive pretrial photographic lineup, then the identification evidence is admissible. *Barley*, 906 S.W.2d at 34; *McGuire*, 2020 WL 1887631, at *6.

Applying our general motion-to-suppress standard of review to the trial court's reliability determination on appeal, we consider the five factors listed above,

13

which are issues of historical fact, deferentially in a light favorable to the trial court's ruling. We then weigh them de novo against any "corrupting effect" of the suggestive pretrial identification procedure. We review the evidence adduced at the admissibility hearing as well as the evidence adduced at trial.

*Balderas*, 517 S.W.3d at 792 (footnotes omitted). When the factors outweigh the deleterious effects of the suggestiveness of the lineup, we uphold the trial court's admission of the identification evidence. *See id.* at 796.

In this case, Estrada complains about the admission of evidence of Escobar's identification in the second lineup and his in-court identification of Estrada. Only if we decide that the lineup was impermissibly suggestive must we examine whether it tainted the in-court identification. *See Barley*, 906 S.W.2d at 34.

## 2. Identification Evidence

Detective Wilson and Escobar testified about Escobar's identification of Estrada as his attacker in both the suppression hearing and the trial. Detective Wilson testified that

- On the morning after the stabbing, Escobar had verbally described his attacker to Detective Wilson, including details about height, weight, hair, facial hair, and similar characteristics;

- Detective Wilson had not heard Estrada's name before the first lineup;

- Estrada's photograph had not been included in the first lineup;

- The photograph of the license plate that Escobar's girlfriend's friend had taken at the gas station had led the police to Tarrant County Appraisal District information, including Estrada's name;

- Detective Wilson had obtained a photograph of Estrada;

14

- That photograph matched Escobar's description of his attacker;

- That photograph was the fourth photograph in the second lineup;

- The second lineup's other five photographs were of similar-looking men;

- Before the second lineup, Detective Wilson had given Escobar a paraphrase of the instructions that he had read to Escobar when he viewed the first lineup the previous day;

- Before the second lineup, even though he had a suspect, Detective Wilson informed Escobar that the array might or might not include a photograph of the perpetrator;

- In the second lineup, Detective Wilson had shown the six photographs to Escobar sequentially;

- Escobar had narrowed his choices from six photographs to the fourth and fifth photographs; the officers then showed him both photographs again at the same time, and he chose the fourth photograph—Estrada's;

- Escobar had told the officers that Estrada's hairline was the distinguishing feature;

- Escobar's providing a reason for his choice had boosted Detective Wilson's confidence in the accuracy of the identification;

- Escobar had indicated that he was "60 to 70 percent sure" that the man in the fourth photograph—Estrada—was the person who had stabbed him;

- That confidence level was "relatively high" in Detective Wilson's experience;

- With the exception that one of the six photographs (not Estrada's) had displayed a "height board," none of the second lineup's photographs had any distinguishing features;

- Detective Wilson did not believe that the height-board distinction of the third photograph in the second lineup had affected Escobar's choosing Estrada's photograph;

- Escobar had signed the page in the photographic lineup containing the photograph of Estrada, the man Escobar identified as his attacker.

- The administration of the second photographic lineup had been videorecorded; and

- The recording fairly and accurately represented that lineup.

Escobar's testimony substantially tracked the detective's but added some new information. Escobar testified that

- He had mentioned his assailant's edge-up or hairline to the police before the lineups;

- A photograph of his assailant had not been in the first lineup, and he had not picked anyone out in the first lineup;

- The second lineup had occurred the day after the first one;

- The detectives had not said or done anything during either lineup to influence him;

- The detectives had not indicated that the suspect would be in the lineups; they told him that the suspect might or might not be in the lineups;

- The detectives had shown him the second lineup's photographs sequentially;

- All six photographs in the second lineup were of Hispanic men;

- Escobar had not seen any differences in the men's heights, weights, hair color, or facial hair;

- He had not noticed anything different about the backgrounds of any of the six photographs;

- He had recognized the person in the fourth photograph as his attacker and had told the detectives so;

- That man was Estrada;

16

- The only difference between Estrada's photograph and the other five in the second lineup was the man's M-shaped "edge-up" or hairline, which Escobar remembered from the assault and which drew his attention to Estrada's photograph;

- Along with the edge-up, the face of the man in the fourth photograph, which Escobar had seen "perfect[ly]" during the assault, had convinced him that the photograph was of his assailant;

- Escobar did not remember struggling between the fourth and fifth photographs;

- Escobar had not considered other people in the lineup as possible suspects;

- When asked, Escobar had told the detectives that he was 60 to 70% or 50 to 70% sure that the person in the fourth photograph had been the attacker;

- Escobar was not sure why he had picked those numbers and had been unsure of what they represented;

- He had initialed the fourth photograph;

- Detective Wilson had told Escobar about ten minutes after the second lineup that the person the police had wrongly suspected in the first lineup was "the driver's girlfriend's other guy" or "side guy";

- Conversely, Escobar had heard the detective say that the police "were going looking for the side guy, probably," and the detective "just mentioned something like that about the side guy";

- At about that same time, Escobar had heard Detective Wilson say that Escobar had picked "the right guy" in the second lineup;

- Conversely, the detectives had never told Escobar that he had picked "the right guy" after the second lineup;

- Escobar had been in close, face-to-face contact with the person who had stabbed him for several minutes;

17

- The gas station's lighting had been "[p]retty good," and Escobar had seen his attacker well;

- The first thing Escobar had noticed about his attacker had been his hairline;

- Escobar also "got a good look" at his attacker's face, hair, hairstyle, facial hair, skin tone, height, weight, build, race, nose, and ears and could estimate his age;

- Escobar had paid close attention because his attacker had been right in front of him, they had been talking, and the man had acted aggressively against Escobar and his girlfriend;

- Escobar had never seen his attacker before the incident;

- The description Escobar had initially given to the police "more or less" matched Estrada;

- Not much time had passed between the stabbing and Escobar's identifying Estrada in the second lineup; and

- Based on his memory of what had happened at the gas station, Escobar could confidently point out his attacker in the courtroom.

Relying only on his memory of what had happened at the gas station, Escobar pointed to Estrada at trial and identified him as the attacker. Escobar testified that based on his memory of the incident, he was 100% confident that Estrada was the person who had stabbed him.

Other evidence—the gas station's surveillance video, the bodycam video of the second lineup procedure, the photograph packet from that procedure, and Martinez's testimony—corroborated the testimony of Escobar and Detective Wilson. The gas station's surveillance video, admitted at trial, shows the length of the encounter and the physical closeness of Escobar and his attacker, although the distance from the

18

camera to the action is too great for the viewer to identify either person. The bodycam recording of the second lineup procedure, admitted during the suppression hearing, shows that Escobar chose the fourth photograph, saw the fifth photograph, compared the two photographs, and then ultimately chose Estrada's photograph, all within a matter of seconds. When pressed to attach a percentage value to his identification after already saying that he was positive that the fourth photograph displayed his attacker and after signing the page containing that photograph, he said 60 to 70%. The recording does not show any impropriety.

The photograph packet from the second lineup, admitted during the suppression hearing and at trial, shows the similarities of the six photographs and Escobar's signature on the page displaying the fourth photograph, which was identified as Estrada. Finally, Martinez testified that she and Estrada, her husband, were involved in the altercation at the gas station and that he admitted to her that he had stabbed Escobar.

### 3. The Trial Court's Rulings

The trial court denied Estrada's motion to suppress, holding that both Escobar's pretrial identification of Estrada and any in-court identification of Estrada by Escobar were admissible. The court stated on the record,

> [A]s a matter of fact and law, looking at the tape and issues, I don't find the interview, the ID, the State's Exhibit 3 [the second photographic lineup] on its face impermissibly suggestive based on the independent review of the contents of it or statements made during the course of that second identification procedure, which is recorded on tape.

19

. . . .

I find the fact that it's 60 to 70 percent sure is something I would love to know sitting in Defense['s] chairs, but that argues against the suggestibility or coaching or any other of the danger signals that they're not 110 percent sure.

. . . .

So looking at the four corners of your motion, I do not find the out-of-court identification procedure was impermissibly suggestive as a matter of fact and law[,] and . . . it did not lead to a likelihood of irreparable misidentification with regards to the in-court procedures.

. . . .

And I will say this, too. Under the broad bands of descriptions that were given and things of that nature and as it turns out there's videos and things that are consistent with observations at the time and descriptions given verbally at the hospital prior to the video being retrieved and evidence, there are things that I find just corroborate that there are issues—the ability of [Escobar] to make a reliable in-court identification if the jury sees fit and I'm not concerned with the 60 or 70 percent aspects.

In denying the motion to suppress, the trial court also expressly held that Estrada's right to due process would not be violated by the admission of the identification evidence.

### 4. Analysis

### a. Pretrial Identification

Although Estrada generally complains that the second photographic lineup was impermissibly suggestive, he does not challenge any individual photograph, the photographic array, or the procedures used by the police in administering the second lineup. Instead, he focuses on Escobar's tentative identification, as shown by his

20

vacillating between the fourth and fifth photographs of the array and his 60–70% confidence level, and Detective Wilson's alleged post-identification statements that the police had the wrong suspect in the first lineup and that Escobar had picked the "right guy." Assessing only the admissibility of the pretrial lineup, we hold that Estrada's focus is misplaced for two reasons.

First, Escobar's uncertain pretrial identification, standing alone, does not affect the admissibility of that identification. Absent a showing that the lineup procedure was impermissibly suggestive, the level of certainty of a witness's identification goes to the weight to be given the evidence, not to its admissibility. *Garza v. State*, 633 S.W.2d 508, 513 (Tex. Crim. App. 1981) (op. on reh'g); *Houston v. State*, No. 14-18-00726-CR, 2020 WL 1883421, at *4 (Tex. App.—Houston [14th Dist.] Apr. 16, 2020, pet. ref'd) (mem. op., not designated for publication); *Harmon v. State*, No. 14-12-00713-CR, 2014 WL 1852172, at *6 (Tex. App.—Houston [14th Dist.] May 6, 2014, no pet.) (mem. op., not designated for publication). Second, Detective Wilson's statements made *after* Escobar identified Estrada's picture could not have affected the pretrial identification that preceded them.[1] *Cf. Jackson v. State*, 657 S.W.2d 123, 128 (Tex. Crim. App. 1983) (holding, in case where the defendant challenged the witness's physical identification of him that occurred within days of the offense, that her misidentification three months later—wrongly identifying six of ten photographs in

---

[1]Estrada's argument that the detective's alleged statements tainted Escobar's in-court identification are addressed in the next section.

21

an array as portraying the man when only one photograph portrayed him—"could not affect the suggestiveness of the [first] confrontation at the time it occurred").

We therefore uphold the trial court's rulings that the pretrial identification, standing alone, was not impermissibly suggestive and that it was admissible. We are not required to reach the reliability prong. *See, e.g., Robertson v. State*, No. 14-15-00132-CR, 2017 WL 124431, at *6 (Tex. App.—Houston [14th Dist.] Jan. 12, 2017, no pet.) (mem. op., not designated for publication) (not reaching the second prong of the test for admissibility of pretrial photographic lineup); *Moore v. State*, No. 2-06-280-CR, 2007 WL 2405126, at *3, *5 (Tex. App.—Fort Worth Aug. 24, 2007, pet. dism'd, untimely filed) (mem. op., not designated for publication) (same).

### b. In-court Identification

Estrada's chief complaint appears to be that the pretrial identification—including Escobar's tentative identification and Detective Wilson's allegedly informing him that he had picked "the right guy" in the second lineup after the police had picked the wrong suspect for the first lineup—tainted Escobar's in-court identification of Estrada. Again, "[d]ue process requires suppression of an in-court identification only if (1) an impermissibly suggestive out of court procedure (2) gave rise to a very substantial likelihood of irreparable misidentification." *Balderas*, 517 S.W.3d at 796. "If an in-court identification has an independent basis other than [a] suggestive pretrial identification procedure, the in-court identification is admissible." *Forte v. State*, 935 S.W.2d 172, 175 (Tex. App.—Fort Worth 1996, pet.

ref'd) (citing *Harris v. State*, 827 S.W.2d 949, 960 (Tex. Crim. App. 1992)).

If Detective Wilson told Escobar that he had chosen the right person in the second lineup, then that was improper. *See Johnson v. State*, 466 S.W.2d 735, 736–37 (Tex. Crim. App. 1971); *Kelly v. State*, 18 S.W.3d 239, 243 (Tex. App.—Amarillo 2000, no pet.). However, Escobar's testimony on that issue conflicts. Viewing the evidence in the light most favorable to the trial court's ruling that the lineup was not impermissibly suggestive and implying the finding that the detective did not tell Escobar that he had chosen the right person, we hold, under the totality of the circumstances, that the second lineup was not impermissibly suggestive as it relates to the in-court identification. *See, e.g., McGuire*, 2020 WL 1887631, at *7.

However, assuming for the sake of argument that Estrada proved that the second lineup including the detective's alleged comments was unduly suggestive, he did not prove that it caused a substantial risk of misidentification. We hold that Escobar's in-court identification of Estrada was reliable, considering the totality of the circumstances. *See Johnson*, 466 S.W.2d at 736–37; *Kelly*, 18 S.W.3d at 243; *Lowe v. State*, No. 05-93-00821-CR, 1995 WL 702608, at *9 (Tex. App.—Dallas Nov. 21, 1995, pet. ref'd) (not designated for publication).

All five reliability factors—(1) the witness's chance to observe the suspect during the offense; (2) the level of attention the witness paid to the suspect during the offense; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty with which the witness identified the suspect; and (5) the time lapse

23

between the offense and the identification—weigh in favor of the admission of Escobar's in-court identification of Estrada. *See Balderas*, 517 S.W.3d at 792.

### i. Application of the Five Factors

### (a) Escobar's Opportunity to View Estrada During the Offense

Escobar was face-to-face with his attacker for several minutes at the gas station. Escobar testified that the attacker was "right in front of [him]" during the incident. Escobar also testified that the gas station was pretty well lit; he saw the attacker's face perfectly; and he "got a good look" at the attacker's hair, hairline, height, build, and ethnicity. The surveillance video from the gas station shows that the men were together for several minutes and that they were very close to each other. This factor weighs in favor of the reliability of Escobar's in-court identification. *See McGuire*, 2020 WL 1887631, at *7, *8.

### (b) The Degree of Attention Escobar Paid Estrada

Escobar testified that he had paid very close attention to his attacker because his attacker had been right in front of him and had behaved aggressively toward Escobar and his girlfriend. *See Cantu v. State*, 738 S.W.2d 249, 253 (Tex. Crim. App. 1987) (reasoning that complainants pay closer attention than casual bystanders); *McGuire*, 2020 WL 1887631, at *7 (same). Escobar's memory of the attacker's hairline suggests a high degree of attention. *See McGuire*, 2020 WL 1887631, at *7, *8 (holding same regarding complainant's memory of shape and placement of defendant's tattoo). This factor weighs in favor of the reliability of Escobar's identification. *See id.*

24

### (c) The Accuracy of Escobar's Description of Estrada

Detective Wilson testified that Escobar gave him a detailed description of his attacker the day after the stabbing and that Estrada's photograph matched that description. Escobar testified that the description he gave the police before the lineups matched Estrada. The jury could compare the photograph of Estrada used in the second lineup with the man they saw on trial. This factor favors the reliability of Escobar's in-court identification. *See id.*

### (d) Escobar's Level of Certainty Regarding the Identification

Escobar was confident of his in-court identification of Estrada as his attacker. He was positive—100% certain—that Estrada was the person who stabbed him, based not on the lineup or the detective's alleged statements but on his memory of the events at the gas station. *See Ibarra v. State*, 11 S.W.3d 189, 195–96 (Tex. Crim. App. 1999). Estrada attempts to cast doubt on Escobar's 100% certainty regarding his in-court identification by pointing to the tentativeness of his pretrial identification. Any discrepancy between Escobar's level of certainty in the pretrial lineup that Estrada's photograph showed the attacker and his 100% certainty that the man he saw at trial was his attacker goes to the weight of the evidence, not its admissibility. *See Balderas*, 517 S.W.3d at 796 ("To the extent that Balderas asserts that Wendy's certainty in her second identification of him was the product of police 'prompting,' we observe that Wendy had already identified Balderas as the gunman by that time. Her greater certainty in her second identification did not undermine its reliability."); *Baskin*

25

*v. State*, 672 S.W.2d 312, 315 (Tex. App.—San Antonio 1984, no pet.) (citing *Jackson*, 657 S.W.2d at 128).

This factor favors the reliability of Escobar's in-court identification.

**(e) The Intervening Time Between the Assault and Escobar's Identification**

The record reveals that Escobar identified Estrada in court almost twenty months after the offense. This length of time does not detract from the reliability of Escobar's in-court identification. *See McGuire*, 2020 WL 1887631, at *8 (upholding admission of in-court identification occurring nineteen months after the offense); *Thomas v. State*, 470 S.W.3d 577, 591–92 (Tex. App.—Houston [1st Dist.] 2015), *aff'd*, 505 S.W.3d 916 (Tex. Crim. App. 2016) (affirming admission of complainant's in-court identification that occurred nearly four-and-a-half years after the crime); *Hamilton v. State*, 300 S.W.3d 14, 19 (Tex. App.—San Antonio 2009, pet. ref'd) (affirming admission of complainant's in-court identification even though it occurred twenty-six months after the crime). This factor does not weigh against the reliability of Escobar's in-court identification.

**ii. Weighing Reliability Factors Against Assumed Suggestiveness of Lineup**

Weighing this evidence of reliability against the assumed suggestiveness of the pretrial lineup and considering the totality of the circumstances, we conclude that no substantial risk of irreparable misidentification was created that could have denied Estrada due process. That is, Estrada failed to prove that Escobar's in-court identification of him was unreliable. The trial court did not err by denying Estrada's

motion to suppress the in-court identification evidence or by admitting it.[2] Because we have held that the trial court did not err by denying Estrada's motion to suppress or by admitting either the pretrial or in-trial identification evidence, we overrule Estrada's third issue.

## III. Conclusion

Having overruled Estrada's three issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 4, 2021

---

[2]Martinez's testimony that Estrada had admitted stabbing Escobar only confirms the correctness of the trial court's ruling. *See Webb v. State*, 760 S.W.2d 263, 272 & n.13 (Tex. Crim. App. 1988).